court. May it please the court, my name is Mark Foti. I represent Mr. Green before this court. I also represented Mr. Green at the trial court, including during the course of his one-week trial. And although there's multiple issues raised, the two issues I want to primarily address with this court are the issues that arose during the course of that trial. And if time permits, I would like to address the other issues if that's acceptable to the court. The first issue that I believe requires this court's attention occurs on the first day of the trial, and that's the jury selection. And during the course of the jury selection, the court takes on the responsibility of ensuring that the defendant, who in this case was a black male in the Western District of New York, is afforded an impartial jury that's protected by the Sixth Amendment, and that that jury be free of any risk of racial bias. The government, in its brief, notes that this court has recognized the importance of removing the possibility of racial bias on a jury, but notes that how to best do that is primarily left in the discretion, in the broad discretion of the trial court, and we don't disagree with that. We're not asking this the implicit bias video that we requested. That's not the holding we're asking for. We're also not asking for a holding that the trial judge was required to ask any specific question that we proposed. And obviously, we proposed a number of specific questions on the issue of race. But we're not asking that the judge, that a determination be made that the judge had to pose those questions. So what do you say about the Supreme Court's ruling in Rosales-Lopez? So Rosales-Lopez was obviously a Supreme Court case from 1981, and I recognize that prior to that case, there was a per se rule in a number of circuits that said that there had to be questions posed related to potential racist bias, and Rosales-Lopez essentially says that that per se rule doesn't exist. And though we're not asking the court here to find that a per se rule exists, I understand that what we're asking is somewhat similar in nature to the idea that a court is required to ask questions if you have a defendant of a particular minority group, and they have requested that the jury be questioned on issues of potential racism. So how can we rule in your favor and be consistent with Rosales-Lopez? Well, I think that the record the court has to consider includes the history that takes place since Rosales-Lopez. I think 1981 was over 40 years ago. And this court in Nieves went to lengths to say that there are circumstances under which the court is, the trial court is required to ask questions that could explore issues of bias. And I understand that that was gang related and that there wasn't, that wasn't broadly related simply to a defendant's race. But broadly related to a defendant's race, there was no questions posed at all here, not a single question. And 1981 was so long ago that we don't have the empirical data that exists now that indicates the existence of implicit bias that is absolutely relevant to a court's determination of how to address within its discretion the effort to eliminate risk of racial bias. And 1981 is decades before the Department of Justice released a memo to its prosecutors and its law enforcement acknowledging the existence of the data supporting implicit bias and acknowledging that even verbalizing the existence of that bias is a means to mitigate against it. There was none of that done before this jury. I guess, but I mean, Rosales-Lopez talks about that it's reversible error where the circumstances indicate there's a reasonable possibility that the racial or ethnic prejudice might have influenced the jury. And all you're offering here is basically the race of the defendant and the race of the defendant, right? I, Judge, I think that there's absolute truth to that. I also think that in 2024, our understanding of what a reasonable possibility of racial bias is much different than it was in 1981. Well, that may be, but the Supreme Court in Rosales-Lopez rejected the notion that there's a per se requirement of a race question or a series of questions. And it seems like what you're suggesting is that that's no longer true because times have changed that we should be adopting a per se rule, notwithstanding Rosales-Lopez. And I think that's the point Judge LaValle is making. How do we do that? I, what I'm asking the Court to do is to recognize that the holding of Rosales-Lopez, that there is certainly constitutional implications to exploring issues of racial bias, is an analysis that requires some degree of questioning or exploration. I, I understand the Court's point. Well, that's tantamount to a per se rule. And, and Rosales-Lopez specifically says a per se rule doesn't exist. I, I, I can only swear that by saying to some degree the holding I'm asking for and the relief we're asking for does ask for a determination by this Court that, based on the data that's been collected in the decades that have followed Rosales-Lopez, including empirical data, as well as information coming from multiple sources, including the Department of Justice, that we find that it is appropriate to probe, at least to some extent, issues of racial bias. And if no questions were going to be posed, then perhaps showing that implicit bias video would have been an alternative means of doing so. But there, there should have been some effort, even if it wasn't specifically grounded in voir dire questions, to address this issue, and that didn't take place. So the argument is that, it's not that the reasonable probability test or possibility test should be jettisoned, but that now we have data that strongly suggests that where we have a defendant of one race and a jury pool overwhelmingly, I don't know the western district, I only know my home districts, but every jury I ever picked was overwhelmingly not of, not of color. When we have that differential, defendant of one race, jury pool overwhelmingly of another or others, that we can, that that is sufficient to show the reasonable possibility, is that the argument? That is. And I think that that's grounded in information that is available to this Court and cited in the brief, which includes information even from the government, as well as very analytical reviews of the data that's been presented that all supports that conclusion. Do we have information in this record as to what the veneer about the racial composition of the veneer or of the particular jury? It's, I don't believe it, I don't believe it is within the record. I think it's, it's a understood fact within the western district. But, I mean, is that the problem? I mean, don't you have to articulate the reasons why there's a reasonable probability of some racial animus or prejudice here? The reason that I don't think that that was done here, Judge, is because when we asked for the implicit bias video and the judge denied it, he ensured Mr. Green that he was going to explore this during his voir dire. And, in fact, when we filed a subsequent memo asking him to reconsider, he denied it in a one-sentence order that said that he's going to extensively address issues of implicit bias in his voir dire. Extensively. That was his promise to Mr. Green. And ultimately, he can The point is that the record is, is silent as to what was the composition of this veneer, right? I, I believe that that's correct. Right. And so, I mean, that didn't have to be the case. I mean, the record, the record could have been made. It just wasn't. I, Judge, I You were the counsel below, right? I, I recognize that, the court's point, that a more complete record could have been created by identifying the predominantly white panel of, of jurors. And, and within the context of that trial Wait a minute, wait a minute. When you say the predominantly white panel of jurors, what's your basis for saying the predominantly white panel of jurors? It's, it's, that's, that's not something that's within the record. I did not address that issue in front of the trial court. I Where, where was the trial conducted? In the western, in Buffalo, New York, in the Western District of New York. In Buffalo, it was in Buffalo? Yes. Which, which is I, I, I believe, I may be wrong, I believe Buffalo has a substantial black population, does it not? Judge, I, the, I know it's not within the record, but as a matter of public record, the Western District of New York is comprised of not just Newark County, where Buffalo is located, but a number of neighboring counties and, that are, are extraordinarily rural. And it is, I believe that the population is about 90% white. So even with a more diverse population within the city of Buffalo, a jury panel within the Western District of New York is drawn from a predominantly white population. And it is rare that there are available jurors of minority groups when, when ultimately we're before the judge for a jury selection. I, I understand I'm well over my time. I, I, in regard to the other issues involving DNA, I just would note briefly that I believe the evidentiary issue that took place during trial was the most significant, but I'll rest on the submission in regard to those matters. I'm sorry, the evidentiary issue, what did you say? The, the evidentiary issue in terms of how the witness and how the government referred to a swab as containing skin cells, although there was nothing, no evidence at all within the record that, that there was any skin cells or any specific biological material related to that swab of evidence. All right. Thank you. Thanks, Mr. Foti. We'll now hear from Ms. Lee. Good morning. May it please the court. My name is Tiffany Lee and I represent the United States. Unlike Mr. Foti, I was not trial counsel below. I just handled the appeal. I would note that with respect to the issue Mr. Foti has raised with respect to some sort of ruling by this court on the issue of what a district court should instruct on the, where there's any, I guess, idea or reasonable possibility of racial bias. The fact remains is that on this record, there is absolutely no evidence for, that the district court had before it, that there was either a constitutionally mandated requirement for an instruction regarding racial bias, nor was there any evidence regarding for this particular trial that there was a need due to perhaps evidence of systemic or a pervasive bias such as that which occurred in Nieves. In Nieves, in light of the fact that the charge involved witness retaliation, involving gang members, there was a need, drawn by the facts of the case, in order to elicit an instruction in terms of any concerns about systemic bias against those who are involved in gang activity. Here, though, this was a felon in possession case where Mr. Green was seen traipsing across multiple neighborhood yards and where multiple witnesses saw him running across the street after the scene of a shooting and where one eyewitness saw him in possession of a gun. Under these circumstances, and especially given the fact that after voir dire was conducted, at no point did Mr. Green ask for additional questioning by the district court in terms of the issue of perhaps reiterating something along the lines of any implicit bias. Accordingly, on that issue, the district court did not abuse its discretion when it did not ask any of the questions proposed by Mr. Green or did not show the video on implicit bias. Well, is there a question that you think covered this? A question in the voir dire? Is there a question that I think... No, no, nothing that I reviewed from the record. However, I would note that basically the questioning was pinpointed to just asking them about the background and, you know, what their experiences and circumstances were. And again, the general admissions, admonitions to a prospective voir dire in terms of what they will have to evaluate when they sit on a jury. I will say, though, again, the record is bereft in terms of what the actual racial makeup of the eventual panel that sat and conducted deliberations for Mr. Green. And as I mentioned, at no point did Mr. Green ask for any further questions after voir dire was conducted by the district court. Accordingly, to the extent that he's now asking for some sort of per se general instruction, that was never asked of the district court itself. Did the government take a position as to whether the court should ask the question that was proposed? The government only took a position, I believe, as to whether or not the implicit bias video proposed by Mr. Green should be shown. Prior, I think the government opposed the showing of the implicit bias video. But did the government express any view as to whether the question should be asked, whether any juror was likely to be influenced by the fact that? I don't recall. I don't recall that from my initial review of the record and preparing this brief. So I don't know. I have a question about a completely different aspect of the of the arguments that are raised here. The defendant contends that that there was a violation of the of 34 U.S.C. 12 5 9 2 in in in using the analysis or the retained sample, arguably in violation of the statutory requirement that the FBI director promptly expunge the DNA analysis, et cetera. The question I have is it seems to me an argument can be made that this is that this is would at best be harmless error because the the the actions in question, the use of the of the DNA evidence from a prior case that was decided in the defendant's favor, which arguably ought to have been had to be expunged under the statute was presented in a in a warrant seeking authorization to get a DNA sample from the defendant. But in that warrant application, the warrant application depended not only on on that arguably illegal reference to prior DNA sample, but also on eyewitness testimony to the effect that the Green himself was observed, identified as the person observed carrying the gun. Now, what does that does that make the whole issue irrelevant to our purposes? I guess irrelevant is an overstatement, but to lead to the result that at worst, it would be harmless error because the warrant would have been a sufficient warrant that would have caused the issuance of the of the warrant to to to take the DNA sample, regardless of whether the the reference to the prior DNA sample had been included or not, does that mean that it just didn't be of concern to us? That would be the government's position, Judge LaValle, that it should not be of concern to this court. And actually, that's what we articulated. First of all, there is no indication that any violation of that DNA indexing statute results in suppression of evidence. There's a lot of confusion. There's absolutely no indication. I mean, that's a legal ruling. That's a legal conclusion. Correct. It does, right? Correct. But we haven't said that. And really, it's not clear that any court has really said that. Correct. So that's why. Maybe somebody should. Well, at this juncture, though, this is not the case for that because of the fact that as as Judge LaValle articulated and as we submitted, the reality is the question becomes, does, should the exclusionary rule be applied here? And what we have is law enforcement going to ask, applying for a search warrant, going before a neutral magistrate, providing probable cause to get a buckle swab on Mr. Green because there was eyewitness testimony and there was eyewitness testimony of him having been in possession of a gun. On that day. And so even if you were to excise all those portions involving the DNA comparison that was done, which we still do not know whether or not that sample came from the DNA index or if it just was retained by a state court for a pending murder investigation. We have no idea. But if we scrub all that, the warrant would still have caused the court to, the warrant application would still have caused the court to issue a warrant to take the DNA swab and everything would have remained the same. Absolutely. And even if, you know, to the extent that as a reviewing court, this court said, well, maybe that's not enough probable cause. The reality is Leon would come into effect in the fact that this warrant was executed in a way that there was no, no evidence that the law enforcement officer was intending to mislead the magistrate in any way and was, you know, provided the facts that were given. And, and therefore, the district court was appropriately denied suppression of the DNA evidence based on this allegation that it somehow violated the DNA index act. I see my time is up unless the court has any further questions. I have a question about a topic that might only interest me. We haven't talked about yet, which is the, the possession of the firearm in connection with another felony, the 2K2.1 enhancement. I know that there were allegations early on in the investigative process that Mr. Green was the one who actually did the shooting. And then we have a fuller process where we go through a full trial where the evidence presented is simply that he possessed it. And I think as counsel's brief points out, there's even in closing, like, look, this isn't about him shooting. This is about him having. And then the PSR simply refers to, again, to, to the government's investigative file, which is where we get that background section of the PSR. Yeah. So what I would like to know is what is the actual evidence to support a preponderance that he was the shooter for the purposes of that enhancement? Because the investigative materials did contain information concerning an eyewitness who said that they had seen, you know. When you say the investigative materials, so the PSR just says investigative materials report. Correct. That's sufficient for a preponderance of the evidence? It is because of the fact that, that this is information that law enforcement has and which also I would note at no point did Mr. Green object to those particular paragraphs outlining these facts. Well, he objects to the enhancement, which it would have been better to say paragraph 14 and paragraph 47. But he clearly objects to the, to the finding that he's the shooter and argues that, you know, at sentencing. I think, I think he objected based on the narrow notion that the only facts that would be sufficient for a preponderance of the evidence analysis is what's elicited at trial. But this court has always determined that even uncharged conduct can be part of the analysis when it comes to enhancements, so long as there's information by preponderance of the evidence. All right, so the answer to the question is that the sole basis for the enhancement is that paragraph of the PSR that says, of course, now I can't put my finger on it, but that there was, that there was an eyewitness who saw Mr. Green actually. Well, is that what the PSR says? In any event, if that one paragraph of the PSR, we'll all look it up later. Correct. But that's what we're relying on. There is nothing else to support this except that paragraph, right? That's my take on it. And the question then, you and I, or your opposing counsel, you might agree or disagree on whether that's enough, but I just want to make sure I'm looking at the right information. You're looking at the right information that was distilled from investigative materials, and they were investigative materials that were acknowledged by counsel at the time of sentencing that was in his possession at. I, let me say that I, I thought your brief was a little unfair on, on the, on the, the narrowing of the quotation from the statement at oral argument, at sentencing argument. The, the government's brief quotes defense counsel as saying like, yes, we're aware that's there. But if you read the whole paragraph, it says we're aware of those allegations. That means you're aware that the investigative materials early on alleged that someone saw him holding the gun or someone saw him firing the gun. I don't think that that is the defendant acknowledging that there is evidence that he fired the gun. I think that was a little unfair. But, but just, that's all I want to know is that's the paragraph we're relying on. That's, that is the paragraph we're relying on. And I understand your point Judge Merriam. If I understand your position, I'm not sure I do understand your position, but it seems to me the point you were just making a moment ago was that the only objection the defendant raised with respect to this is not, that the defendant was not objecting as to the insufficiency of the, of the information provided in the PSR. But he was objecting, I understood, I thought I understood you to say, the only objection he was making is saying the court is limited in what it considered to information that was elicited as part of the evidence at trial and cannot be using stuff from the PSR report and not making the objection about the sufficiency of what was in the PSR report. Which is as to whether it is available to be used for, for, to support such an enhancement as opposed to trial evidence. That's how I read his objections, only because of the fact that they were very. Is that how we should read this again? I think so. Mr. Green was very specific in his objections to facts that were included vis-a-vis the information concerning his previous acquittal not being part of the PSR. So when you're looking at the, you know, the, the four corners of the PSR in terms of what facts are available for a district court to make findings on, at no point did. Did he say the court may consider only trial evidence and not PSR evidence? No, he, what he said was, at no point during the trial was there any admission or any evidence with respect to the shooting, the discharge of the. Goes on to say, quote, and I don't believe that any other documentation presented to the court is in support of that. And in which point, you know, it was noted that there was investigative material that had information concerning that, which is where that information landed in the PSR describing a witness, at least, at least one witness, I think, seen, seen. Can you give us exactly what it said in the PSR? Pardon? Can you give us exactly what it said? I don't have the PSR in front of me. I'm, I'm sorry. It says, it was determined through numerous witness interviews and street camera footage that Ernest Green, the defendant, was operating the gray Honda Accord that had crashed into the above listed tree. And the defendant did shoot at the unknown males on a sidewalk within the town gardens. So convoluted syntax aside, that's the, that's the, that's the statement we rely on. Correct. Unless there are any further questions. I have one other question. It relates to the other enhancement, the enhancement for perjury under 3C1.1. I mean, we typically, and we've got a number of cases now that do require a court to provide a little more meat on the bones as to why this constitutes perjury. In this case, basically, the defendant said he didn't possess a gun. The jury returned a verdict concluding that he obviously did possess a gun. And it seems like what you're arguing is that when, when those are the charges and that's the testimony, then we really don't need the court to do what we said they should do in Dunningham. That they don't have to really make findings about all the elements of a perjury violation. Is that really what you're arguing? Your Honor, what I said was, basically, the standard is if the district court's factual findings are plausible in light of the record viewed in its entirety. Then district court's findings should be affirmed. Well, the findings were just that you committed perjury. There was no real discussion about the elements of perjury, which is what in Dunningham we told the court they're supposed to do. Now, I mean, I don't know that they have such a heavy lift here. It's just the district court didn't do the very things we said to do in Dunningham, right? That's true. However, this court also noted, or in Dunningham, the Supreme Court also noted that while it is preferable for a court to address each element in a separate and clear finding. A court can also satisfy these requirements by finding an obstruction of or for finding a perjury. But, I mean, that just means so anybody who gets on the stand and denies the crime and gets convicted of the crime is, by definition, then guilty of perjury, it seems to me is what you're saying. What I'm saying is here, at least, the district court noted specifically the denial of having any weapon and determined that Mr. Green did, in fact, testify falsely and did obstruct justice. That said, the government realizes that to the extent this court chooses to remand, it should remand for a very limited purpose for the district court to make further findings in support of the 3C1.1 enhancement. All right. Well, thank you very much. We'll now hear again from Mr. Foti for two minutes. Mr. Foti, maybe we can just pick up where we left off. I mean, I guess I'm not sure what would be the point of sending this back to the district court to follow strictly sort of the language of Dunnegan. But, I mean, what would be the argument, if we remanded from you, as to why this isn't perjury, to say I never touched the gun, I never possessed the gun? Judge, in terms of our argument, I think that ultimately that would be addressed at the time that the judge indicates what information he's relying on. And I don't have the argument necessarily prepared today in terms of how we would respond to that. But I do think that it is an argument that's supposed to be addressed by the trial court. And I think that the fact that Mr. Green did give an accounting of what happened that was inconsistent with what investigative materials had involving unnamed eyewitnesses to a shooting, that's further indication that there was a record of inconsistency regarding the other objection related to sentencing. And in terms of the investigative materials, as at least is often the case in the Western District of New York, when there's eyewitnesses referred to with investigative material, they're not identified unless they become witnesses and their disclosure is recorded. But, I mean, did you ask for a FATICO on the, I mean, now I guess we've moved, maybe we've moved over to the other enhancement, which is a four-level enhancement. I mean, did you ask for a FATICO as to whether or not you used the firearm in furtherance of the? I don't, I don't, I think ultimately to the government's point of where might the. Well, I mean, there's a PSR, right? The PSR makes assertions about what the investigation uncovered and that there were witnesses who made your client, who identified your client as the driver and the shooter. And so it's not really clear that you objected to that portion of the PSR. If you did object to it, I would think that the next remedy would be we want a FATICO on this. I think the issue, the reason that the defense was limited in terms of asking for a FATICO hearing is because asking for a FATICO hearing would have been some acknowledgment that the case was more expansive than what the government had said in its closing statement. The government had said this is simply a possession case and it's not about a shooting. They specifically ruled that out as. Oh, okay. But at the time of sentencing, it was the real sentencing regime we're in. So at the time of sentencing, there is the possibility of this enhancement. If you want to dispute the facts on which the enhancement is based, you get to do that, even if it didn't come up at trial. But you didn't do that, right? I did not dispute, other than that the investigative materials would not present sufficient basis for a probable cause analysis, I did not dispute the content of those allegations based on a position that the case, as identified by the government who presented it, did not include those allegations. I do think that if the case was expansive enough to include the shooting, in contrast to what the government said, then an investigative, a FATICO hearing might be a means of addressing the limitation on what's in the PSR. But it simply unidentified eyewitnesses, and the investigative material that I had didn't do anything to suggest that there was any sort of conclusive proof to that. And for some reason, the government did not include any of that in its trial presentation, which should give some additional indicia of unreliability as to what was referenced in regard to investigative material. It's not the least bit unusual to face a circumstance where the information that becomes available to the court through the pre-sentence report includes pejorative stuff that's likely to increase the defendant's sentence, if relied on, which was not part of the trial evidence, and indeed is not related to the defendant's offense. It happens all the time in certain contexts, such as, like, a conspiracy, and there's reference to specific cooperating sources that reference transactions or weight that would ultimately become part of relevant conduct. I don't think that that's consistent with the circumstances here, where we have a possession case, and the enhancement relates to something that would become – would be part of that case, that the shooting – any allegation of a shooting that's referenced in investigative materials is not part of the case. That's – Well, but, counsel, it – even if it is, the question about the Fatico hearing, my question for you is, the government has the burden of establishing the facts necessary to establish the enhancement, right? Yes. Yes. So it is – I'm not asking you to articulate this necessarily, but it's possible to make a strategic decision to say, I'm going to roll the dice that what the government has put forward is insufficient, rather than giving them an opportunity to put more evidence in the record about the shooting. But at the end of the day, as long as you've objected, I guess I'll ask, did the government attempt to or actually produce any additional information other than the paragraph from the PSR at the time of sentencing to support the enhancement? They did not. And a Fatico hearing, you're right, would have been really an opportunity for the government to expand the factual presentation of proof beyond simply reference to investigative materials that generally states there were eyewitnesses. That's why there are so few Fatico hearings. Right. That's – The defendant has the right to ask for them, but the defendant also has the right not to ask for them. And that is the right that the defendant is most frequently reliant on. I'm not asking for a Fatico hearing. There's also so few cases, Your Honor, I believe that the reference to investigative materials is as brief as it was in this PSR. I think ultimately, even when there's confidential sources, there's often some identification of information was provided by CS1 or CD1, and there's an identification of what the content of these general allegations are. That's not laid out in any way whatsoever here, just that there is some reference to these things within the investigative material. So I do believe that there's a basis to remand and hold a new sentencing hearing, but ultimately, going back to the original point, I ask this Court to remand and have a new trial. The one-week trial had multiple issues that I think supports having this case go back and having it done in a manner that ensures there's no risk of racial bias, and further, as addressed in the brief, that the DNA evidence, if allowed to be presented to the jury, that it be done so appropriately and not misconstrued to suggest a type of biological material that's not there. All right. Thank you, Mr. Foote. Ms. Lee will reserve decision.